**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, Petitioner,**

v.

**AL HAMILTON CONTRACTING COMPANY, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 8, 1995.

Decided Sept. 12, 1995.

Reargument Denied Nov. 2, 1995.

Michael J. Heilman, Assistant Counsel, for petitioner.

William C. Kriner, for respondent.

Before PELLEGRINI and FRIEDMAN, JJ., and SILVESTRI, Senior Judge.

SILVESTRI, Senior Judge.

The Commonwealth of Pennsylvania, Department of Environmental Resources (Department) petitions for review of an order of the Environmental Hearing Board (Board), dated July 27, 1994, that sustained the appeal of Al Hamilton Contracting Company (Hamilton) from the Department's February 22, 1988 compliance order (C.O. 88–H–008), as amended by the Department's administrative order of October 21, 1988.

Beginning in August of 1977, Hamilton conducted surface mining operations at the Caledonia Pike Mine Site (mine site) in Covington Township, Clearfield County pursuant to a mine drainage permit, MDP 4577SM8, and a surface mining permit, SMP 17773155.[1] In 1979, Hamilton built an erosion and sedimentation pond, Pond Four, at the mine site. The area in which Pond Four was located was within the boundaries of MDP 4577SM8 but outside the boundaries of SMP 17773155.

On February 22, 1988, the Department issued a compliance order, C.O. 88–H–008, pertaining to the operations conducted under SMP 17773155 which cited Hamilton for, amongst other things, causing or allowing a discharge of acid mine drainage from six different discharge areas.[2] One of the dis-charge areas in question, discharge area four (DA4), is located in the vicinity of Pond Four. On October 21, 1988, the Department issued an administrative order which amended C.O. 88–H–008 to include the area encompassed by MDP 4577SM8 as well as the area encompassed by SMP 17773155. Hamilton appealed both the Department's compliance order and its administrative order to the Board.

Hearings were held before the Board on September 17–19, 1990 and October 3, 1990. At various points throughout the hearings, the Department sought to introduce into evidence Exhibit C–10 which had been prepared by John Scott Berry (Berry), a hydrogeologist for the Bureau of Mining and Reclamation. Exhibit C–10 was a composite map of the mine site and the surrounding area created from a photocopy of a map submitted by Hamilton as part of its application for MDP 4577SM8. Exhibit C–10 also contained several additional markings made by Berry which represented the location of the various discharge areas and computer-generated structure contour lines. Hamilton repeatedly objected to the introduction of Exhibit C–10 into evidence. At the conclusion of the hearing on September 19, 1990, the Board stated its intention to defer ruling on the admissibility of Exhibit C–10 pending briefs by the parties on the issue. The Department concluded its case on October 3, 1990 and Hamilton did not present any evidence.

On October 10, 1990, Hamilton filed a motion to sustain its appeal. By order of October 29, 1992, the Board sustained Hamilton's objection to the admission of Exhibit C–10 into evidence. In so doing, the Board concluded that Exhibit C–10 was inadmissible under the "best evidence rule" and also that it does not satisfy the test for the admissibility of scientific evidence set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).

---

1. SMP 17773155 was not issued by the Department to Hamilton until May 11, 1984 pursuant to a primacy program under the federal Surface Mine Control Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328. Prior to attaining primacy over the federal program, the Department had issued mine drainage permits, such as MDP 4577SM8, to regulate the discharge of mine drainage to the waters of the Commonwealth. Because it did not include areas that had already been mined, reclaimed, or were awaiting completion reports, SMP 17773155 encompassed a smaller area than MDP 4577SM8.

2. On April 7, 1988, the Department issued a compliance order, C.O. 88–H–008A, which amended C.O. 88–H–008 by extending the compliance date; however, Hamilton did not file a notice of appeal from C.O. 88–H–008A.

By order of December 24, 1992, the Board granted Hamilton's motion to sustain appeal on all counts except liability for DA4.[3] In so doing, the Board concluded that, since it had already ruled that Exhibit C–10 was inadmissible, Exhibit C–10 could not be used to establish a *prima facie* case of Hamilton's liability with regard to discharge areas one, two, three, five, and six.[4] The Board further concluded, however, that

> [a]lthough the Department presented no evidence as to the location of this sediment pond, under § 87.108(a) it is deemed to be within Hamilton's MDP. The Board can infer from the location of DA four on the breastwork of the sediment pond that DA four is located within the boundaries of Hamilton's MDP. Because the discharge from DA four exceeds the effluent limits of 25 Pa.Code § 87.102 and the location of DA four is deemed to be within Hamilton's permit area the Department has established a *prima facie* case that Hamilton is liable for that discharge.

Thus, the Board's decision merely determined that the Department had established a *prima facie* case with regard to DA4 without resolving the question of Hamilton's liability for the same.

Upon a motion for reconsideration by the Department, the Board, by order of April 1, 1993, affirmed its decision and order of December 24, 1992. The Department then filed a petition for review of the Board's April 1, 1993 order with this Court which concluded that the Board's order as such was interlocutory because liability for DA4 had not yet been determined. By order of July 13, 1993, this Court quashed the Department's petition for review and remanded to the Board for additional proceedings.

Following the remand hearing conducted on October 12, 1993 on the issue of liability for discharge area four, the Board issued an adjudication and order provided as follows:

> AND NOW, this 27th day of July, 1994, it is ordered that:
>
> 1) Hamilton's appeal from the Department's February 7, 1989, Groundwater Study Order, originally docketed at No. 89–045–W, is dismissed as moot;[5]
>
> 2) Hamilton's appeal from C.O. 88–H–008 is sustained; and
>
> 3) Hamilton's appeal from the Department's October 21, 1988, Administrative Order is sustained.

It is from this order of the Board dated July 27, 1994 that the Department currently petitions for review.

In the discussion portion of its adjudication, the Board noted that merely because the Department had presented a *prima facie* case against Hamilton, the Department has not automatically satisfied its burden of proof. The Board then concluded that Hamilton is not liable for the discharge emanating from DA4 because the Department failed to prove that DA4 is hydrogeologically connect-

---

**3.** The Board entered the following order:

AND NOW, this 24th day of December, 1992, it is ordered that Hamilton's motion to sustain appeal is granted in part and denied in part:

1) Hamilton's motion is granted with regard to its liability for DAs one, two, three, five, and six;

2) Hamilton's motion is denied with regard to DA four: (sic) and

3) Hamilton's motion is granted with regard to violations two, three, and four in the compliance and administrative orders.

**4.** Liability for discharge violations from surface mining activities is governed by Section 315(a) of the Clean Streams Law (Law), Act of June 22, 1937, P.L.1987, *as amended*, added by Section 5 of the Act of August 23, 1965, P.L. 372, *as amended*, 35 P.S. § 691.315(a). To establish liability under Section 315(a) of the Law, the Department must prove that the discharges emanating from the six discharge areas in question violated the effluent limitations of 25 Pa.Code § 87.102 and that Hamilton's mining operations caused the discharges. The Department can prove that Hamilton caused the discharges if it can show that the discharges were either located within Hamilton's permitted area or hydrogeologically connected to Hamilton's mining operations.

**5.** This portion of the Board's order is not subject to the within petition for review. The Department had previously vacated the groundwater study order on August 24, 1990 and the Board granted the Department's motion to limit the issues argued at the hearings on the merits thereby excluding the same from argument. The Board therefore concluded that since there was no relief which it could grant with regard to the groundwater study order, Hamilton's appeal of the same would be dismissed as moot.

ed to Hamilton's mining activities or that it is located within the boundaries of Hamilton's permitted area. The Board further concluded that, as a result thereof, the remainder of Hamilton's appeal from C.O. 88–H–008, as amended by the October 21, 1988, Administrative Order, should be sustained.

■ The Department contends that the Board erred by not admitting Exhibit C–10 into evidence for various reasons. The Department first contends that the Board incorrectly applied the "best evidence rule" to exclude Exhibit C–10 from evidence. The "best evidence rule" limits the method of proving the terms of a writing to the presentation of the original writing, where the terms of the instrument are material[6] to the issue at hand, unless the original is shown to be unavailable through no fault of the proponent. *Warren v. Mosites Construction Co.,* 253 Pa.Superior Ct. 395, 385 A.2d 397 (1978). The Board concluded that Exhibit C–10 is not admissible into evidence because it was a photocopy of a map submitted by Hamilton as part of its application for MDP 4577SM8 and the Department failed to provide any excuses for the absence of MDP 4577SM8 map. In so doing, the Board apparently determined that the best evidence of Exhibit C–10 is the MDP 4577SM8 map. While Exhibit C–10 was admittedly made from a photocopy of the MDP 4577SM8 map, it also contains, as previously noted, computer-generated structure contour lines and markings which represented the location of the various discharge areas. Thus, Exhibit C–10 is an original writing separate and apart from the MDP 4577SM8 map and as such, the "best evidence rule" does not bar its admission into evidence.

The Department next contends that the Board erroneously applied the *Frye* test[7] to exclude Exhibit C–10 from evidence. The Board determined that Exhibit C–10 was inadmissible under the *Frye* test since the Department failed to establish that the method of producing the computer-generated structure contour lines was generally accepted within the relevant scientific field of hydrogeology. The Board concluded that the Department had not introduced any evidence indicating that the use of a computer program that converts locations and depths into a topographical contour model has gained general acceptance in the field of hydrogeology. In effect, the Board determined that the Department failed to lay the proper foundation for the use of such evidence.

■ The Department contends that Exhibit C–10 is not scientific evidence and therefore the test for its admissibility should be whether it accurately represents what it purports to represent. *See* Leonard Packel and Anne B. Poulin, Pennsylvania Evidence 681 (1987). The essence of the Department's argument is that it does not matter how the map was developed as long as the map is a fair and accurate portrayal of what it seeks to depict. While we agree with the Department in this regard, the question remains whether Exhibit C–10 satisfies this standard and should have been admitted.

■ Exhibit C–10 is a computer-generated structure contour map[8] which purports to illustrate the inclination and elevation of the geologic strata of a coal seam that lies beneath the ground's surface. Berry testified that the computer projection in question was prepared from drill hole data taken from an

6. While the case law is not entirely clear as to when the terms of a writing are material so as to require the presentation of the original writing, where the terms of a writing are not closely related to a controlling issue or where there does not appear to be a substantial dispute about the terms of the writing, then courts tend to say that the terms are not material or are only collateral and the "best evidence rule" is not applicable. *See* Leonard Packel and Anne B. Poulin, Pennsylvania Evidence 696–698 (1987). The Department contends that the contents of Exhibit C–10 itself are not at issue and that the information in Exhibit C–10 is merely evidence of Hamilton's liability. Admittedly, Exhibit C–10 is the only

document which shows the location of the mine site and the location of the discharge areas. Clearly, the contents of Exhibit C–10 are therefore material to the issue at hand.

7. The *Frye* test governs the admission of scientific evidence and requires that a piece of scientific evidence must have gained general acceptance in the particular field in which it belongs.

8. A structure contour map may assist a hydrogeologist in evaluating the direction of groundwater flow since the orientation of strata is a factor which may affect groundwater flow.

exhibit not introduced into evidence. (R.R. 124a, 228–230, 242). Berry further testified that the map was developed with the use of a digitizer,[9] a computer, and a plotter.[10] Berry also testified that he hand traced the computer-generated contour lines from the plotted document onto Exhibit C–10. (R.R. 239a–240a.) Berry acknowledged that the structure contour lines could have been drawn without the use of the computer but that the computer was used for the simple reason that it was quicker. (R.R. 241a–242a.) Berry conceded that he was unfamiliar with the particulars of how each of the aforementioned machines operated. (R.R. 241a.)

The Department contends that Exhibit C–10 is a fair and accurate portrayal of what it seeks to depict because Berry testified that the structure contour lines generated by the computer looked reasonable to him. (R.R. 244a.) Berry, however, further testified as follows:

Q Now, Mr. Berry, the fact is that you cannot vouch for the accuracy of these lines because they were not produced by you, they were produced by a computer?

A I would not vouch for the accuracy. However, I would rely on the accuracy.

Q But the only reason you'd rely on the accuracy is because it was produced by a computer and a plotter?

A And that it is a reasonable plot of the information.

. . . .

Q Okay, and the reason it seems reasonable is because this is the way John Berry would have done it?

A Yes, . . . .

(R.R. 248a–251a.) In effect, Berry merely testified that what the document generated by the computer appeared to be consistent with what he would have produced had he in fact done so personally. (R.R. 250a.) We cannot say, based upon our review of the record, that the Department satisfied its burden of establishing that Exhibit C–10 accurately represents what it purports to represent. Accordingly, the Board did not err by not admitting Exhibit C–10 into evidence.[11]

■ The Department also contends that the Board, by deferring its ruling on the admissibility of Exhibit C–10, fatally prejudiced its case. The Department contends that the Board should have ruled on the admissibility of Exhibit C–10 at the hearing when the Department could have attempted to cure any defects or shortcomings in its case. The Department requests that the matter should be remanded for further proceedings and directions to allow the Department an opportunity to cure the evidentiary deficiencies which the Board found after the Department's case was closed.[12] The Department failed, however, to raise this issue at the time of the hearings and did not object to the Board's suggestion that the matter be deferred pending the filing of briefs in support thereof. Since the Department acquiesced in the Board's actions in deferring the evidentiary ruling, it cannot now complain of such conduct thus having effectively waived the issue.

The Department's final contention is that the Board erred in concluding that Hamilton

---

9. Berry testified that a digitizer is a black box most frequently used to measure acreage but can also be used to determine an X and Y coordinate on a given piece of paper. The digitizer was used herein to pinpoint the location of the test holes; this data was subsequently programmed into the computer. (R.R. 124a–125a.) Berry acknowledged that he did not know how the digitizer worked and therefore referred to it as a "mystery box." (R.R. 231a.)

10. The plotter is a machine which mechanically draws the contour map from the information generated by the computer. (R.R. 237a.)

11. The Department also contends that Exhibit C–10 was improperly excluded from evidence because the initial decision regarding the admissibility of such document was made by a single Board member. The Department contends that individual Board members have no authority to make decisions and that only the Board as a whole has the power to act. See 35 P.S. § 7514(a). However, in its April 1, 1993 opinion, the whole Board adopted the individual Board member's October 29, 1992 decision which sustained Hamilton's objection to the admission of Exhibit C–10 into evidence.

12. We note that the Board's opinion barring the admission of Exhibit C–10 into evidence was filed on October 29, 1992 and that the final hearing in the underlying matter was not held until October 12, 1993.

was not liable for any of the discharge areas in question. The Department concedes, however, that Exhibit C–10 is the "linchpin" of its case against Hamilton and that Exhibit C–10 is the only document which shows the location of Hamilton's mine site and the location of the discharge areas. The Department acknowledges that the Board's conclusion regarding Hamilton's liability is not supported by substantial evidence in the record only if the evidence rejected by the Board, i.e. Exhibit C–10, is considered. Having already determined that the Board did not err by excluding Exhibit C–10 from evidence, we need not engage in speculation of whether the decision of the Board regarding Hamilton's liability should have been otherwise had Exhibit C–10 in fact been admitted.

Accordingly, the order of the Board, dated July 27, 1994, will be affirmed.

### ORDER

AND NOW, this 12th day of September, 1995, the order of the Environmental Hearing Board, dated July 27, 1994, is affirmed.

PELLEGRINI, Judge, dissenting.

I respectfully dissent from the majority's affirmance of the Environmental Hearing Board's (Board) July 27, 1994 Order sustaining the appeal of Al Hamilton Contracting Company (Hamilton) because it agreed that the Board properly excluded a map offered into evidence. I disagree because I believe that the map was properly authenticated and should have been admitted.

The Department of Environmental Resources (Department) issued a compliance order and administrative order when it found that Hamilton caused or allowed a discharge of acid mine drainage from six different discharge areas from a mine it operated in Clearfield County. Hamilton appealed both orders to the Board.

To establish Hamilton's violation, the Department sought to introduce into evidence Exhibit C–10. Exhibit C–10 is a computer-generated structure contour map which purportedly illustrates the inclination and elevation of the geologic strata of a coal seam that lies beneath the ground's surface. The purpose of Exhibit C–10 was to show the location and character of the sites from which the acid mine drainage occurred. Exhibit C–10 was critical to the Department's case because it was the only document which demonstrated the location of the mine site and the discharge areas.

Exhibit C–10 was created by Mr. John Scott Berry, a Bureau of Mining and Reclamation hydrogeologist. It was based on a photocopy of the Hamilton permit map, submitted to the Department by Hamilton as part of his application for a surface mining permit, with the addition of specific information which Berry gathered from his investigations of the mine site and the surrounding area. Berry, through the use of the photocopy of the permit map, a digitizer, a plotter and a computer program entitled "SURFER", created Exhibit C–10 to purportedly show the mine site, its surface contour lines, and discharge areas. Hamilton objected to the admission of Exhibit C–10 because the creator of the exhibit could not testify how the digitizer, computer and plotter changed the information he "fed" into the system to graphically represent that information.

The Board sustained Hamilton's objection to the admission of Exhibit C–10 into evidence for two reasons. First, it found that its admission would violate the "best evidence rule"[1] because the Exhibit was based on a photocopy of the original permit map. It also excluded Exhibit C–10 because it did not comply with the requirement set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923),[2] that scientific evidence must have

---

**1.** The Best Evidence Rule is a common law rule which requires that the admission of the original document be used to prove the contents of a writing. *Noble C. Quandel Co. v. Slough Flooring, Inc.,* 384 Pa.Superior Ct. 236, 558 A.2d 99 (1989). The Best Evidence Rule applies where the terms of the instrument are material to the issue involved and limits the manner by which those terms may be proven to the presentation of

the original instrument, unless it can be proven that the original is unavailable through no fault of the proponent. *Warren v. Mosites Construction Co.,* 253 Pa.Superior Ct. 395, 402, 385 A.2d 397, 400 (1978).

**2.** *Frye* is no longer good law. In 1993, the Supreme Court of the United States in *Daubert v. Merrell Dow Pharmaceuticals,* — U.S. ——, 113

gained general acceptance in the particular field in which it belongs to be admissible, because the Department did not introduce any evidence indicating the use of computer-generated structure contour models to be generally accepted among hydrogeologists. Because Exhibit C–10 was not admissible, the Board found that the Department failed to establish that there was acid mine drainage from these sites and sustained Hamilton's appeal.

In affirming the Board, the majority does not apply the *Frye* rule nor the best evidence rule. While stating that it accepts the Department's contention that if the map is a fair and accurate portrayal of what it seeks to depict, the way in which it was developed is of no consequence, the majority's analysis is otherwise. It holds that because Berry could not explain the functions and particulars of the digitizer, computer and plotter used to develop the structure contour portion of Exhibit C–10, it was not admissible into evidence.

Exhibit C–10 is nothing more than a photocopy of an original map submitted by Hamilton, to which the Department, with the assistance of a computer graphics program and other mechanical devices, added specific information based upon the mine site and the surrounding area. Although Exhibit C–10 was created with the assistance of a computer software package, that Berry cannot explain how it turns the data provided into a graphical representation (i.e., the map), so long as it accurately represents the site it purports to represent, this alone cannot be the basis for the denial of its admission into evidence. *Albig v. Municipal Authority of Westmoreland County*, 348 Pa.Superior Ct. 505, 502 A.2d 658 (1985).[3]

Berry, qualified as an expert in hydrogeology and water quality, verified the structure contour map produced with the assistance of the computer program "SURFER", as well as the information upon which the structure contour lines were based. He verified the map by comparing it with calculations and information he gathered when he visited the mine site between 10 and 12 times. He verified the accuracy of the structure contour lines drawn by "SURFER" by comparing the contour lines with test holes and coal elevation at those holes, and found there to be good correspondence. Berry is familiar with the software used to generate the contour map and has testified that such software and related equipment produces reliable maps. Berry concluded that the computer-generated structure contour map is an accurate plot and is basically the same as he would have created had he done so by hand.

His testimony that Exhibit C–10 is a fair and accurate portrayal of the mine site was uncontradicted and uncontested by Hamilton, whose only objection was that the photocopied map on which C–10 was based was distorted by photocopying and was not the best evidence. To say that Exhibit C–10 was inadmissible is like saying a photograph cannot be introduced into evidence, even though it accurately portrays the scene because the witness cannot expound on the dye sublimation process in photo developing. Regardless of the manner in which the Exhibit was prepared, it was adequately authenticated and verified and should have been admitted

S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that the Federal Rules of Evidence, not *Frye*, set forth the standard for the admission of expert scientific testimony. The critical issue in the determination of whether scientific evidence should be admissible became whether the expert's testimony is based on a reliable foundation and is relevant to the task at hand. *Daubert* at ——, 113 S.Ct. at 2798–99, 125 L.Ed.2d at 485.

**3.** The law governing the admissibility of computer-generated evidence in the form of maps and models is sparse. However, in *Perma Research & Development v. Singer Co.*, 542 F.2d 111 (2d Cir.), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976), the court permitted the testimony of experts concerning a critical issue where such testimony was based upon a computer model which the experts had prepared for litigation. In that case, the widely-cited dissent argued that the testimony should not have been permissible because the computer technique used was experimental, the model did not take into account a wide range of factors, the testimony was based solely on hearsay, the plaintiff did not supply the data, program and output to the defendant in advance of the trial, nor would the experts disclose the manner in which the computer was programmed. Berry's testimony complies with even the dissent's strictures.

into evidence. Accordingly, I respectfully dissent.