# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Murrysville Watch Committee,   :
            Appellant   :
  :
      v.   :
  :
Municipality of Murrysville Zoning   :
Hearing Board and Municipality of   :
Murrysville   :
  :   No. 579 C.D. 2020
      v.   :
  :   Argued: May 10, 2021
Olympus Energy LLC   :
  :
      v.   :
  :
David and Cindy Gesuale, Douglas   :
and David Geiger, Barry and Pamela   :
Paulisick, Free Gospel Church, Inc.,   :
Doris and Jurgen Ekbert, and Samuel   :
and Regina Staymates   :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge[1]

## *OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                    FILED: January 24, 2022

---

[1] This case was argued before a panel of the Court that included former Judge Crompton. Because Judge Crompton recused himself in this matter after argument, this matter was submitted on briefs to Judge Ceisler as a member of the argument panel. Judge Crompton's service on the Court ended December 31, 2021.

The Murrysville Watch Committee (MWC), on behalf of itself and several individual members (Objectors),[2] appeals from the May 13, 2020 order of the Court of Common Pleas of Westmoreland County (trial court), affirming the decision of the Murrysville Zoning Hearing Board (Board) that denied its substantive validity challenge to current section 220-31(CC) of the Municipality of Murrysville's (Municipality) Zoning Ordinance (Ordinance),[3] which permits unconventional oil and gas drilling and operations as a conditional use in the Municipality's Oil and Gas Recovery Overlay District (Overlay District). The Overlay District is located within residential districts in the Municipality (R Districts), including a portion of the rural residential district (R-R District).

**Background**

On May 3, 2017, the Municipality adopted Oil and Gas Ordinance 930-15, which repealed and replaced former section 220-31(CC) of the Ordinance (2017 Amendment). (Reproduced Record (R.R.) at 467a-83a.) Among other challenges, the MWC contends that the 2017 Amendment violates substantive due process under article I, section 1 of the Pennsylvania Constitution, Pa. Const. art. I, §1, runs afoul of article I, section 27 of the Pennsylvania Constitution, Pa. Const. art. I, §27, known as the Environmental Rights Amendment (ERA), violates article III, section 32 of the Pennsylvania Constitution, Pa. Const. art. III, §32, relating to special legislation and equal protection, constitutes illegal spot zoning, and contravenes various provisions

---

[2] The Objectors are Dominique Ponko, Barbara Sims, Debra Borowiec, Joe Evans, Judy Evans, Susan Stewart-Bayne, and Jean Martin.

[3] Municipality of Murrysville, Pennsylvania, Ordinance §220-31(CC) (2017).

2

of the Pennsylvania Municipalities Planning Code (MPC).[4]  The MWC further asserts that the Board committed evidentiary-based errors, particularly with regard to its request for an adverse inference, the admission of testimony by a purported expert, and the denial of its request to subpoena members of the Municipality's Council (Council).

The parties to the instant case are the MWC, the Board, and the Municipality, as well as Intervenor Olympus Energy LLC (Olympus), an energy development company with a pending unconventional natural gas well site in the Municipality, and a group of Intervenor landowners who have entered into natural gas leases with oil and gas operators (Landowners).[5]  By way of background,

> the initial [O]rdinance regulating oil and gas development in the Municipality was adopted in 1965, allowing oil and gas wells as permitted uses with minimal additional requirements in all zoning districts.  Municipality Ordinance No. 680-05 was adopted in 2005, and it permitted oil and gas extraction in all zoning districts in the Municipality as a conditional use. The Ordinance was amended to provide additional restrictions on development in 2011, creating an [Overlay District] comprising approximately 37% of the [M]unicipality and imposing many additional regulations.  The Overlay District allows for unconventional oil and gas development only in certain zoning districts, including portions of the [R-R District]. The Ordinance was further limited and amended by [the 2017 Amendment], which imposed stricter setbacks and additional requirements.
>
> In its present form, as codified in the Municipality['s] Code of Ordinances as [s]ection 220-31(CC)[, the 2017

---

[4] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§10101-11202.

[5] Landowners are David and Cindy Gesuale, Douglas and David Geiger, Barry and Pamela Paulisick, Free Gospel Church, Inc., Doris and Jurgen Ekbert, and Samuel and Regina Staymates.

Amendment,] requires a comprehensive application by any potential unconventional oil and natural gas developer, which includes all relevant permits, a detailed survey[,] and property owner authorizations. The sites are subject to 750[-]foot setbacks from all protected structures. The [oil and gas producer] is [also] required to comply with stringent traffic regulations, fencing and impoundment guidelines, hours of operations limitations, inspections by the Municipality[,] and aesthetic integration standards, among other requirements.

(Trial court op. at 2-3.)

In 2018, Huntley and Huntley Energy Exploration, LLC (HHEX) submitted a conditional use application for the construction of an unconventional well pad (the Titan Pad) in a part of the R-R District that is located within the Overlay District. On October 29, 2018, the MWC filed a substantive validity challenge to the 2017 Amendment. The Board thereafter held multiple hearings and summarized the testimony presented at those hearings, in pertinent part, as follows:

Jim Morrison testified on behalf of the Municipality []. Mr. Morrison is employed as the Chief Administrator of the Municipality . . . and is responsible for the day to day supervision of municipal operations[,] including [the] development of Ordinances [and] managing the planning, staff[ing], and dealing with land developments generally within the [M]unicipality. Mr. Morrison testified regarding the enactment of [the 2017 Amendment]. Mr. Morrison testified that in his estimate, thousands of hours by staff and volunteers, [b]oroughs[,] and elected officials culminated in the adoption of said Ordinance. Mr. Morrison testified that [the Municipality] has a history of gas development; namely, with conventional wells as a conditional use in [3] of the [4] residential districts in the community as governed essentially by the [former] Pennsylvania State Oil and Gas Act [Oil and Gas Act of 1984][6]; namely, the R-R District,

---

[6] Act of December 19, 1984, P.L. 1140, *as amended*, *formerly* 58 P.S. §§601.101-601.605, repealed by the Act of February 14, 2002, P.L. 87.

4

R-1 District and R-2 District. Mr. Morrison [also] testified as to the creation of a [T]ask [F]orce . . . to create a detailed study, as authorized by [the Council], with regard to oil and gas development in the [M]unicipality. He testified that Ordinance 833-11 was the first unconventional well Ordinance [and was] adopted in 2012. Mr. Morrison then testified as to the time and efforts involved in following gas and oil development law in the Commonwealth and discussed the numerous meetings conducted by the [T]ask [F]orce[,] which was the [way] that the Municipality [] approached [] unconventional drilling. Mr. Morrison indicated . . . that the work of the [T]ask [F]orce was completed over a [6]-year period in the development of [] Ordinance[] 833-11 and [the 2017 Amendment]. Mr. Morrison's extensive testimony presented [] the [Board with] the timeline, the background[,] and other factors that went into the drafting of [the 2017 Amendment].

Following extensive examination, cross-examination and re-direct examination[,] and re-cross of Mr. Morrison, his substantial testimony of 283 transcript pages was considered by the Board.

Dennis Skeers testified for the [MWC]. Mr. Skeers testified that he is a resident of Murry Highland Circle in Murrysville. He further indicated that he is [the] President of the [MWC], which is a group of citizens from the Municipality [] and nearby surroundings, developed over the years, [and] working and advocating for what they consider to be a sound Ordinance. . . .

Mr. Skeers testified as to his recollection of the meeting process of the [T]ask [F]orce, enabled by the Municipality [], which culminated in the presentation of a report to the Council []. Mr. Skeers testified that the [T]ask [F]orce meetings were not open to the public. Mr. Skeers testified as to his [legal] position and that of his organization with regard to the work of the [T]ask [F]orce and the findings thereof.

Lori Statam testified on behalf of the [MWC]. Ms. Statam testified that she is a resident of Hilty Road, in Export, adjacent to the proposed well site. Ms. Statam testified that

5

she operates a horse farm with Friesian horses imported from Holland. Ms. Statam testified that her property is situated adjacent to the proposed well site on Bollinger Road, which she described as being on the upper level. Ms. Statam testified that the road winds around to Hilty Road and has identified her location as downwind to the east of the proposed well site. She expressed concern with regard to the [6] to [10] baby horses produced each year and the possible impact upon them including the fertility of mares and stallions; namely, as a result of benzine. Ms. Statam presented testimony with regard to her concern involving the [water] wells that service her property, the risks presented to her by the well drilling companies[,] and [the] private testing that she had performed upon the water servicing her property.

Jason Gehringer testified for [HHEX]. Mr. Gehringer testified as a [geographic information systems (GIS)] analyst for [HHEX] describing his work as spaciously analyzing, creating[,] and maintaining data for the enterprise data base for the various departments and employees of HHEX. It is specifically noted that Mr. Gehringer was not called as an expert witness but was called as a fact witness to plot existing information that is available in public and other data bases. Mr. Gehringer testified with regard to distances from various properties to the edge of the well pad and location of the hall route.

Cynthia Gesuale testified as an intervenor [Landowner]. Ms. Gesuale testified that she is a resident of Hoy Farm Court located within the Municipality [] but with an Export mailing address. Ms. Gesuale testified that she owns approximately 57 acres of land with her husband, David, having owned the same since 1995. She testified that the property is subject to an oil and gas lease with [HHEX]. Ms. Gesuale testified that she attended all but one of the informational meetings, during [which] the subject of oil and gas amendments were debated or discussed in [the Municipality], and also attended informational meetings at which representatives of the Pennsylvania Department of Environmental Protection [(DEP)] presented information to [the Municipality].

(Board's decision at 1-2.)

Following the hearings, the Board denied MWC's substantive validity challenge. In so doing, the Board issued 167 findings of fact, and the following findings represent those that are most critical to the legal issues presented in this appeal:

> 29.  The Municipality has a history of gas development and had permitted conventional wells as a conditional use in three of the four residential zoning districts (R-R, R-1, and R-2). Drilling [was] governed by the [former] Pennsylvania Oil and Gas Act of 1984 and the Municipality's [Ordinance].
>
> 30.  The only residential district where conventional gas wells were not permitted was in the Municipality's least restrictive and most dense zoning district, the R-3 District, which contains smaller lot sizes.
>
> 31.  The [] Ordinance continues to permit conventional gas wells as a conditional use in the R-R, R-1, and R-2 zoning districts, but does not permit them in the R-3 district.
>
> . . . .
>
> 34.  In 2010, the [Council] created a [T]ask [F]orce comprised of residents, public officials, and experts in the field to investigate unconventional wells as a use in the Municipality and to begin the process of creating an ordinance to address unconventional wells [].
>
> . . . .
>
> 39. The Municipality began to review the 2011 Amendment [to the Ordinance] after the Pennsylvania Supreme Court's *Robinson Township* decision in 2013.[7]

---

[7] *Robinson Township v. Commonwealth*, 83 A.3d 901, 954 (Pa. 2013) (plurality).

Murrysville was one of the municipalities that supported the filing of the action opposing Act 13.[8]

40.     [The] Council determined that it would be in the best interest of the community to reconvene the Task Force to review the 2011 Amendment to see what, if anything, should be updated.   In March 2014, [the] Council authorized revising the 2011 Amendment and reconvened the Task Force to review the ordinance in light of the *Robinson Township* decision.

41.     Between March 2014 and May 2015, the Task Force met nine times to review the 2011 Amendment and provided three briefing reports to [the] Council.  From April 2014 to May 2017, the Municipality held four public hearings, four public educational sessions, and five Planning Commission meetings to discuss potential options to determine appropriate locations for unconventional oil and gas drilling sites.   The subject of oil and gas also appeared 23 times on [the] Council's agenda during that same time period.

. . . .

47.     Preparation of the revised ordinance was done in conjunction with the Municipality's review of other municipal oil and gas ordinances and research on oil and gas regulation in Pennsylvania and other states.

. . . .

49.     During [the] development of the [2017 Amendment], the Municipality was also updating its Comprehensive Plan. As part of the Comprehensive Plan update, the Municipality prepared a map that identified potential future development areas for the next 10 years, the next 10 to 20 years, and beyond 20 years.

. . . .

---

[8] 58 Pa.C.S. §§2301-3504.

51.    Because the Municipality is primarily a residential community, with 93[%] of the community being zoned residential, one of the guiding principles in developing the [2017 Amendment] was to minimize the impact of unconventional drilling to the greatest extent possible on the existing population.

. . . .

53.    Approximately five percent of the Municipality is in the B-1 Business District. The Municipality does not have an industrial zoning district. The Municipality concluded that the B-1 District would not be suitable for unconventional drilling based upon the density of the district and the availability of open space within the district.

. . . .

60.    While reviewing the 600-foot setback requirement of the 2011 Amendment and taking into consideration the Supreme Court's *Robinson Township* decision, Mr. Morrison indicated that the Task Force's goal was to increase setbacks if possible. In considering increasing the setback distance, the Task Force tried to balance residents' property rights while appropriately providing for unconventional gas drilling. The Task Force attempted to provide the maximum protection to residents and minimize potential impacts on community property values, while at the same time providing for unconventional gas drilling.

. . . .

63.    The Task Force looked at well pad sizes on permitted well sites in neighboring municipalities. Mr. Morrison reviewed a chart he prepared that provided a comparison of assumed setback acreage available in the Municipality when applying factors such as setback distances and slope percentages.

64.    Based on its review, the Task Force concluded that the minimum well pad size was approximately 3 1/2 acres. The Task Force used this acreage as its basis for the preparation of the zoning map.

65. The Task Force determined that any parcel exceeding 3 1/2 acres but approaching [5] acres could be considered for well pad development.

. . . .

71. The bulk of the Overlay District created by the 2011 Amendment was in the R-R District.

72. There were no material changes in the Overlay District between the 2011 Amendment and the [2017 Amendment].

73. The [2017 Amendment] increased the required setback [distance] to 750 feet from the edge of the well pad to a protected structure and reduced the areas available for oil and gas development. The actual wellbore is typically in or around the middle of a well pad, so there would be additional distance from the edge of the well pad to the wellbore. By comparison, the Act 13 setback [was] 500 feet from the wellbore, not from the edge of the well pad as required by the 2017 Amendment.

. . . .

75. The [2017 Amendment] contains 17 pages of requirements with which an oil and gas operator must comply in order to perform unconventional drilling in the Municipality.

. . . .

79. The Municipality's Environmental Advisory Council ([]EAC[]) also reviews conditional use applications at advertised meetings, which the public is invited to attend. As of the date of Mr. Morrison's testimony, the EAC had reviewed the Titan Pad conditional use application at two of its meetings.

80. Once the EAC and [the] Planning Commission have completed their respective reviews of the Titan Pad conditional use application, the conditional use application

10

is referred to [the] Council. [The] Council advertises and holds a public hearing, and at the conclusion of the public hearing, publicly votes on the conditional use application.

. . . .

84. Under the MPC and the Municipality's [Subdivision and Land Development Ordinance (SALDO)], [the] Council may impose conditions on the Titan Pad land development application to the extent set forth in the SALDO.

85. The Municipality has additional requirements related to the approval of the Titan Pad, including road bonding for excess weight vehicles using posted Municipal roads, a driveway permit for construction of the access road, and a grading permit.

86. None of the individual Objectors testified at the public hearing on the [substantive] [v]alidity [c]hallenge.

87. Mr. Skeers is the President of the MWC and lives in the Municipality. . . . He has lived at this address for 16 years.

. . . .

101. It is Mr. Skeers' position that unconventional gas drilling should be in an industrial zoning district, and not in a residential district. Mr. Skeers would not have any objections if unconventional drilling was placed into an industrial zoning district, even if that district did not have enough acreage and effectively banned the use from the Municipality.

. . . .

106. Ms. Statam identified herself as a supporter of the MWC. She has lived in the Municipality . . . for 12 years. Ms. Statam stated that she lives across the street from the proposed Titan Pad.

. . . .

11

117. Ms. Statam expressed concerns about benzene and its impact on the fertility of the mares and stallions that are kept on her farm due to the proximity of her property to the proposed Titan Pad. She also expressed concerns about potential mining subsidence on her property based on past mining in the Municipality.

118. Ms. Statam stated that large triaxle trucks visit her property from time to time to place extra gravel on her road.

119. Ms. Statam indicated that larger sized trucks, such as concrete trucks, drive past her property a couple of times a week, not to visit her property but to go elsewhere. She stated that these larger size trucks are noisy. These trucks come closer than 750 feet to her home and horse farm.

120. Mr. Gehringer serves as a [GIS] analyst for HHEX. Mr. Gehringer's primary responsibilities are to spatially analyze, create, and maintain data for the enterprise geodatabase for the various departments and employees of HHEX. In addition, he handles all mapping requests. This includes taking public and other regularly generated data and plotting it out on maps.

. . . .

122. Mr. Gehringer prepared a map denoting the "no drill zones" in the Municipality, *i.e.*, those areas located outside the Overlay District. The map also illustrated the Overlay District, and the location of the Titan Pad within it, along with the proposed truck route. The map showed the distances from the edge of [] Objectors' properties to the edge of the Titan Pad. [] Objectors' homes are located a greater distance from the Titan Pad than the edges of their property lines.

123. The distance from the edge of Objector Dominique Ponko's property to the edge of the Titan Pad is 3,304 feet.

124. The distance from the edge of Objector Barbara Sims's property to the edge of the Titan pad is 10,007 feet.

12

125. The distance from the edge of Objectors Joe and Judy Evans' property to the edge of the Titan pad is 10,160 feet.

126. The distance from the edge of Objector Susan Stewart-Bayne's property to the edge of the Titan Pad is 15,969 feet.

127. The distance from the edge of Objector Jean Martin's property to the edge of the Titan Pad is 5,510 feet.

. . . .

135. There are 148 active conventional shallow wells in the Municipality.

. . . .

140. [] Objectors' properties are all located closer to existing oil and gas facilities, gas transmission lines, or gas wells than they are to the Titan Pad.

141. The total acreage of the Municipality subject to oil and gas leases is 11,613 acres, which is approximately 49.3[%] of the Municipality's land mass.

142. Of the total leased acreage in the Municipality, 7,000 acres are located within the Overlay District, which is 76.8[%] of Overlay District's land mass.

143. 4,613 acres are leased outside the Overlay District, which is 23.2[%] of the land mass outside the Overlay District.

. . . .

146. Since 1965, the levels of Muncipal regulation of, and limitations on, oil and gas development have become increasingly stricter . . . .

(Board's Findings of Fact (F.F.) at Nos. 29-31, 34, 39-41, 47, 49, 51, 53, 60, 63-65, 71-73, 75, 79-80, 84-87, 101, 106, 117-20, 122-27, 135, 140-43, 146) (citations to the record omitted).

13

On further appeal, the trial court, without receiving additional evidence, affirmed the Board's decision denying the MWC's substantive validity challenge to the 2017 Amendment. In so doing, the trial court concluded that this Court's decisions in *Frederick v. Allegheny Township Zoning Hearing Board*, 196 A.3d 677 (Pa. Cmwlth. 2018) (*en banc*), *Delaware Riverkeeper Network v. Middlesex Township Zoning Hearing Board* (Pa. Cmwlth., No. 2609 C.D. 2015, filed June 16, 2019) (unreported), and *Protect PT v. Penn Township Zoning Hearing Board*, 220 A.3d 1174 (Pa. Cmwlth. 2019), effectively foreclosed the MWC's constitutional and statutory challenges. In notable part, the trial court succinctly concluded:

> A review of the record shows that the [MWC] set forth no evidence that would differentiate the [2017 Amendment] in the present case from any of the ordinances which were upheld on appeal [to this Court] and discussed *supra*; in fact the [2017 Amendment] is more protective of the citizens of [the Municipality] than the above-cited cases. . . . The [Board] was not acting arbitrarily in finding [the MWC's] contention that unconventional well development is incompatible with the R-R District to be unsupported by any evidence and contrary to precedent[ial] law.

(Trial court op. at 7.)

The MWC appealed to this Court.

## Discussion

As mentioned previously, the MWC mounts various constitutional and statutory challenges to the 2017 Amendment. The MWC also asserts that the Board committed evidentiary-related errors during the proceedings.

14

# I. Substantive Due Process/Spot Zoning

The MWC contends that the 2017 Amendment violates substantive due process because unconventional oil and gas drilling is an industrial land use and is incompatible with the stated purpose of the R-R District. The MWC asserts that the Overlay District imposed upon the R-R District was created "merely . . . to allow for the profiting from the emerging shale gas energy boom, not for the legislative and required police power purpose of protecting the public health." (MWC's Br. at 22.) Somewhat similarly, the MWC states that the 2017 Amendment, by "[a]llowing oil and gas drilling and waste water impoundments into the R-R zoning district[,] constitutes an unconstitutional 'spot zone,' as the surrounding residential uses and purpose of the district are incompatible with the use as further evidenced by some areas in the R-R zoning district being excluded from the overlay." (MWC's Br. at 26.)

Initially, we recognize that "[a] zoning ordinance is presumed to be valid. Therefore, one challenging the zoning ordinance has the heavy burden of establishing its invalidity. Where the validity of the zoning ordinance is debatable, the legislative judgment of the governing body must control." *Woll v. Monaghan Township*, 948 A.2d 933, 938 (Pa. Cmwlth. 2008). "In Pennsylvania, the constitutionality of a zoning ordinance is reviewed under a substantive due process analysis." *Plaxton v. Lycoming County Zoning Hearing Board*, 986 A.2d 199, 204 (Pa. Cmwlth. 2009). "Under such analysis, the party challenging the validity of provisions of the zoning ordinance must establish that they are arbitrary and unreasonable and have no substantial relationship to promoting the public health, safety, and welfare." *Id.* Further, "the exercise of judgment in regard to zoning regulations will not be interfered with except where there is obviously no relation to

15

health, safety, morals or general welfare." *Ethan-Michael, Inc. v. Board of Supervisors of Union Township*, 918 A.2d 203, 210 (Pa. Cmwlth. 2007).

Further, under Pennsylvania law, "spot zoning is the unreasonable or arbitrary zoning classification of a small parcel of land, dissected or set apart from surrounding properties, with no reasonable basis for the differential zoning." *Penn Street, L.P. v. East Lampeter Township Zoning Hearing Board*, 84 A.3d 1114, 1120 (Pa. Cmwlth. 2014). "The most determinative factor in an analysis of a spot zoning question is whether the parcel in question is being treated unjustifiably different from similar surrounding land, thus creating an 'island' having no relevant differences from its neighbors." *Id.* at 1121 (citation omitted).

In its decision, the Board addressed these issues in the following findings of fact:

> 45. The Council acted within its constitutional police power in adopting the [the 2017 Amendment] to further the general welfare of its citizens by permitting them to benefit economically from unconventional natural gas resources and royalties, in order to help their livelihood and way of life. At the same time, [the Council] took into account the interests of the general public by adopting an extensive regulatory regime, far beyond that imposed on any other use, addressing issues such as required yards, setbacks, water withdrawal, wastewater disposal, erosion and sediment control, public notice, traffic impact, noise management, emergency response[,] and roadway maintenance and repair. The [2017 Amendment] also requires applicants for unconventional natural gas drilling to proceed through the public conditional use and land development processes, which can result in the imposition of numerous additional requirements and limitations.
>
> . . . .
>
> 47. The [2017 Amendment] promotes the public health, safety, and welfare of the community by requiring that

16

unconventional natural gas development comply with rigorous state and federal permitting requirements, and by supplementing those requirements with additional standards and criteria aimed at mitigating local impact. . . .

48.   In summary, applying the substantive due process balancing test, the Board concludes that the Council did not violate Objectors' due process rights in adopting the Zoning Ordinance.

(Board's F.F. at Nos. 45, 47-48) (internal citations omitted).

In sum, the Board concluded:

63.   The Overlay District constitutes rational planning and balancing of interests as evidenced by: (i) the area within the Overlay District has limited public infrastructure; (ii) the area within the Overlay District has the least density of structures, thereby limiting unconventional oil and gas operations to less dense residential and agricultural areas; and (iii) only [5%] of the Overlay District is useable for unconventional oil and gas wells when the 2017 Ordinance setback and the steep slope regulations are taken into account.

(Board's Conclusion of Law (C.O.L.) at No. 63.)

In addressing the MWC's substantive due process challenge on appeal, the trial court determined:

That the [Board] in this case took into consideration the health, safety and welfare of the Municipality's residents is supported by the record.   Taking into account all of the [2017 Amendment's] requirements, the [Board] found that only 5% of the [O]verlay [D]istrict is actually [and presently] usable for drilling and development.   The [Board] additionally set out detailed findings regarding the rigorous and transparent process of deliberation, information gathering and development that the Municipality engaged in over a period of years in enacting the Ordinance in view of the health and safety of the community.   The [Board] also noted that [the MWC] failed to meet its burden of showing that the challenged Ordinance

17

is "arbitrary, unreasonable and unrelated to the public health, safety, morals and general welfare," because it did not present any scientific or expert testimony in support of this contention, as analogous to the situation in *Frederick*, 196 A.3d [at] 687[.]

(Trial court op. at 6-7) (some internal citations omitted).

With respect to the MWC's assertion that the 2017 Amendment constituted illegal spot zoning, the trial court opined:

[The MWC] attempts to liken the Overlay District to impermissible "spot zoning" . . . . On the contrary, the [Board] found by competent evidence that the Overlay District is a sizable area that was chosen, not arbitrarily, but based on factors such as population density and locations of infrastructure.

(Trial court op. at 12.)

In *Frederick*, this Court rejected a substantive due process challenge to an ordinance that permitted unconventional oil and gas drilling as a permitted use by right in all of the municipality's zoning districts, subject to numerous standards or conditions, which, *inter alia*, related to road safety; the clearing of brush and trees; emergency planning; dust, noise, and lighting controls; and security measures. The objectors in that case contended that the oil and gas ordinance contravened substantive due process because the township failed to (1) consider the public interest of the community as a whole; (2) protect the lives, morals, health, comfort, and general welfare; and (3) ensure that an individual's use of his property will not infringe upon the property rights of neighboring property owners. The objectors further asserted that unconventional oil and gas development is incompatible with the uses allowed in the township's residential districts and that the township failed to designate uses within the same district that are compatible with each other and, thus, engaged in impermissible "spot zoning."

An *en banc* panel of this Court disagreed, reasoning, in relevant part, as follows:

> Here, the [z]oning [b]oard found that oil and gas operations have long existed in the R-2 [z]oning [d]istrict and provide needed income to [t]ownship residents, particularly farmers, so that they can maintain "their livelihood and way of life." Notably, in *Robinson Township*[], 83 A.3d at 954, the plurality recognized "that development promoting the economic well[]being of the citizenry obviously is a legitimate state interest." The [z]oning [b]oard found, as fact, that oil and gas operations, including shale gas development, have compatibly coexisted with other uses in the [t]ownship's rural areas for many years . . . .

*Frederick*, 196 A.3d at 688 (some internal citations omitted).

Although the objectors in *Frederick* presented expert testimony as to the adverse effects of unconventional drilling on the environment and public health, the zoning board found that testimony to be not credible. As such, this Court upheld the zoning board's determination that the objectors "did not present credible, substantial evidence" that the oil and gas pad "will, in fact, have any adverse effect on public health, safety, welfare or the environment." *Id.* We stated that, instead, the "[o]bjectors presume, without any supporting evidence, that oil and gas operations, by their very nature, adversely affect property rights," and rejected this assumption because "[m]ere speculation is insufficient to establish a real possibility of concrete harm to their property rights." *Id.* at 688-89. In passing, we noted that "a gas well operator engaged in hydraulic fracturing and drilling operations is not subject to strict liability in tort" because "natural gas drilling does not constitute an abnormally dangerous activity" and the "risks may be substantially reduced through the exercise of due care in this field." *Id.* at 689 n.17 (citing and quoting *Ely v. Cabot Oil & Gas Corp.*, 38 F. Supp. 3d 518, 520, 531 (M.D. Pa. 2014)).

19

This Court in *Frederick* then addressed the objectors' argument "that an 'industrial' use such as a natural gas well is incompatible with and must be segregated from the other uses in the R-2 [z]oning [d]istrict." *Id.* at 690. We noted that the "[o]bjectors call[ed] oil and gas drilling 'industrial' throughout their briefs," but "presented no evidence to the [z]oning [b]oard on what they meant by 'industrial' or the significance of that term." *Id.* at 690 n.20. Reviewing the record, this Court determined that the objectors failed to establish that unconventional gas drilling was a use that was incompatible with residential districts, or any zoning district for that matter, and determined that the evidence instead showed that "the municipality has evaluated its landscape and has chosen to allow oil and gas operations to take place in every zoning district, so long as certain exacting standards are satisfied." *Id.* at 691.

For these reasons, the *Frederick* Court concluded that the township's oil and gas ordinance did not violate substantive due process and did not constitute illegal spot zoning.

In *Protect PT*, the objectors challenged the constitutionality of a township's Mineral Extraction Overlay (MEO) District to the extent that it permitted unconventional natural gas development (UNGD) in the Resource District, which consisted of low-density residential properties. The objectors contended that the Resource District was essentially a growing suburban community and that UNGD is a heavy industrial activity that is incompatible with residential use and the preservation of the environment. Relying on *Frederick* to find no merit in the objectors' substantive due process claim, this Court stated:

> Similarly here, the fact-finding trial court held that the [t]ownship, in determining that UNGD is a proper use in the MEO District overlaying sparsely populated areas of the Resource District, engaged in lengthy proceedings before enacting the [z]oning [o]rdinance. The question of what

20

best serves the public interest is primarily a question for the appropriate legislative body in a given situation. During these proceedings, the [t]ownship carefully and appropriately balanced its obligation to provide for property owners' development and management of minerals with its obligation to protect the health, safety and welfare of neighboring Resource District property owners. Based on our review of the record, we conclude the trial court's determinations are supported by substantial evidence.

220 A.3d at 1192.

Upon review of the record and proceedings below, we concur in the trial court's conclusions that the 2017 Amendment does not violate substantive due process or constitute unlawful spot zoning. It is apparent that the Overlay District was enacted to encourage greater economic development, via unconventional oil and gas drilling, which is a legitimate state interest. *See Robinson Township*, 83 A.3d at 954. As in *Frederick* and *Protect PT*, the Municipality has a long history of oil and gas development, beginning in 1965, when it permitted conventional oil and gas extraction in all zoning districts as a conditional use. (Trial court op. at 2-3.) Importantly, the MWC failed to introduce evidence to establish that oil and gas drilling, as authorized in the Overlay District, was incompatible with the uses or overall character of the three residential zoning districts in which the Overlay District is located. The MWC also failed to adduce competent evidence that the 2017 Amendment was unreasonable and unrelated to the public health, safety, morals, and general welfare.

To the contrary, the record demonstrates that the Municipality carefully and appropriately balanced the goal of economic development with its obligation to protect the health, safety, and welfare of property owners in the Overlay District. For instance, the Municipality created a Task Force, which "attempted to provide [] maximum protection to its residents and minimize potential impacts on community

21

property values," (Board's F.F. at No. 60), and the 2017 Amendment "contains 17 pages of requirements with which an oil and gas operator must comply in order to perform unconventional gas drilling." (Board's F.F. at No. 75). Specifically, akin to the ordinances in *Frederick* and *Protect PT*, the 2017 Amendment requires, among other things, that an oil and gas producer submit a comprehensive application, including all relevant permits and a detailed survey; the well sites are subject to 750-foot setbacks from all protected structures; and the proposed development is required to comply with stringent traffic regulations, fencing and impoundment guidelines, hours of operations limitations, inspections by the Municipality, and aesthetic integration standards. (Trial court op. at 2-3.) Further, the 2017 Amendment imposes requirements related to "required yards, setbacks, water withdrawal, wastewater disposal, erosion and sediment control, public notice, traffic impact, noise management, emergency response[,] and roadway maintenance and repair." (Board's F.F. at No. 45.) In addition, the EAC reviews conditional use applications, and the Council may impose additional conditions on the oil and gas project as set forth in the SALDO. (Board's F.F. at Nos. 83-84.) Significantly, the MWC does not challenge any of the Board's specific findings of fact, and it is well settled that "[u]ndisputed findings of fact are binding on this Court." *West Perry School District v. Pennsylvania Labor Relations Board*, 752 A.2d 461, 463 n.5 (Pa. Cmwlth. 2000).

Therefore, we conclude that the MWC failed to establish that the 2017 Amendment runs afoul of substantive due process or constitutes unlawful spot zoning.

## II. The ERA

The MWC asserts that the 2017 Amendment violates the ERA[9] because it failed to adequately consider the effect of unconventional oil and gas drilling on the environment and the citizens' constitutional rights to clean air and water. The MWC claims that the 2017 Amendment was designed solely to ensure that more drilling would occur, but the legislative body of the Municipality failed to review any public health evidence when enacting the 2017 Amendment. In this light, the MWC suggests, without any supporting evidence, that a setback distance of 750 feet is woefully inadequate.

At its core, the ERA "protects the people from governmental action that unreasonably causes actual or likely deterioration" of public natural resources. *Robinson Township*, 83 A.3d at 953. Stated in somewhat different terms, "to achieve recognition of the[] rights enumerated in the first clause of [the ERA] as 'inviolate' necessarily implies that economic development cannot take place at the expense of an unreasonable degradation of [public natural resources]." *Id.* at 954. Instead, "when government acts, the action must, on balance, reasonably account for the environmental features of the affected locale." *Id.* at 953. Recently, in *Frederick*, this Court formulated the test to be used under the ERA. We concluded that judicial

---

[9] This constitutional provision provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall preserve and maintain them for the benefit of all the people.

Pa. Const. art. I, §27.

review of governmental action entails a two-step inquiry "to determine, first, whether the values in the first clause of the [ERA] are implicated and, second, whether the governmental action unreasonably impairs those values." 196 A.3d at 695.

Here, the Board's conclusions of law relevant to the MWC's ERA challenge are as follows:

> 65. [The MWC] presented no scientific or expert testimony supporting [its] contention that an unconventional oil and gas operation produces unreasonable amounts of air pollution, water pollution, noise pollution, truck traffic or is generally hazardous to the residents of [the Municipality] and its adjacent neighbors.
>
> 66. [The MWC] presented no scientific or expert testimony supporting [its] contention that the 750[-]feet setback from the edge of the well pad to any protected structures is insufficient to protect [its members'] property, the environment or the public health, safety or welfare of the residents of [the Municipality].
>
> . . . .
>
> 72. [The MWC] failed to meet [its] burden of proving that the [2017 Amendment] will adversely impact or harm [its members'] property rights, the environment or the public health, safety and welfare.
>
> 73. [The MWC] failed to meet [its] burden of proving that the [2017 Amendment] unreasonably impairs the rights of the residents of [the Municipality] to clean air and pure water.
>
> 74. [The MWC] failed to meet [its] burden of proving that the [2017 Amendment] does not reasonably account for the natural, scenic, historic and esthetic values of [the Municipality's] environment.

(Board's C.O.L. at Nos. 65-66, 72-74.)

24

In disposing of the MWC's ERA claim, the trial court offered the following rationale:

[The MWC's] argument here largely mirrors its argument with regard to substantive due process, discussed above. Again, it is clear that the Municipality did take into consideration environmental impacts of the Ordinance, as indicated by the exhaustive recitation in the [Board's] [d]ecision of the [2017 Amendment's] pre-adoption procedure. The [Board] notes that far less restrictive ordinances have been upheld by Pennsylvania Appellate Courts under an ERA analysis, and that [the MWC's] argument with regard to compliance with Pennsylvania's ERA must fail.

(Trial court op. at 10-11) (internal citation omitted).

In *Frederick*, this Court dismissed the objectors' ERA claim and employed the following rationale:

Zoning accounts for the "natural, scenic, historic and esthetic values of the environment." Pa. Const. art. I, §27. It does so by placing compatible uses in the same zoning district; by establishing minimum lot sizes and dimensional requirements; providing parking and signage controls; and requiring landscape and screening controls. This list goes on. It is axiomatic that a zoning ordinance must balance the public interests of the community with the due process rights of private property owners. . . .

[The] [o]bjectors assert the [t]ownship did not "genuinely consider" the environment in the enactment of Zoning Ordinance 01-2010 or in the issuance of the permit to [the oil and gas operator]. They presume, contrary to the plurality's instruction in *Robinson Township*[], 83 A.3d at 952, that local governments must enact "specific affirmative measures" to protect the environment that are duplicative of the many state laws that regulate oil and gas operations in Pennsylvania. . . .

25

> In sum, a municipality may use its zoning powers only to regulate *where* mineral extraction takes place. A municipality does not regulate how the gas drilling will be done. [The objectors'] complaints about the purported harm to the environment from the operations of the [well] [p]ad project should have been addressed to the state agencies that issued [the oil and gas operator] its operating permits. . . .

> [The objectors] did not prove that [the] [z]oning [o]rdinance [ ] is a law that "unreasonably impairs" their rights under the [ERA]. [The objectors] did not prove that [the] [z]oning [o]rdinance [ ] does not reasonably account for the natural, scenic, historic and esthetic values of the [t]ownship's environment. Indeed, [the board] reached the contrary conclusion. It credited the testimony of [the oil and gas operator's] expert . . . who stated that there is a long history of oil and gas development safely coexisting with agricultural uses in the rural areas of the [t]ownship and that unconventional gas development will actually help preserve farming in the R-2 District. We hold that [the] [z]oning [o]rdinance [ ] does not violate the [ERA].

*Frederick*, 196 A.3d at 692-98 (footnotes omitted and emphasis in original). Importantly, this Court in *Frederick* determined "that construing the [ERA] to require some sort of 'pre-action environmental impact analysis' is a novel construction without any foundation in Pennsylvania Law" and declined to impose a burden on a municipality to prove that it engaged in such an analysis. *Id.* at 700.

In *Protect PT*, the objectors asserted that, although the township held many meetings prior to enacting the zoning ordinance, there was no evidence in the record that the township "actually identified or evaluated the environmental impacts of its decision-making in creating the MEO District," and, as such, the township "failed to consider the environmental impacts of its decision." 220 A.3d at 1197. In addition, the objectors argued that "the [t]ownship succumbed to the pressure of the [oil and gas industry's] interests looking to conduct UNGD in the [t]ownship" by

26

"imposing industry-preferred standards" in the ordinance. *Id.* Thus, according to the objectors, "the [t]ownship's enactment of the MEO District violate[d] the ERA and [would] result in unreasonable environmental degradation in the [t]ownship." *Id.*

We disagreed with these contentions and dismissed the objectors' ERA claim. Initially, this Court noted that the zoning ordinance stated that an applicant for a permit must establish that its oil and gas project will comply with the ERA and will not violate the citizens' rights thereunder. More specifically, the ordinance obligated the applicant for a permit to include in the application reports from qualified environmental individuals attesting that the proposed location will not negatively impact the township residents' environmental rights. The ordinance also required an applicant to submit air modelling and hydrogeological studies relating to potential pathways in an event a spill or release of fluid would occur. This Court in *Protect PT* then stated:

> As reflected by . . . the [z]oning [o]rdinance, the [t]ownship did consider its residents' rights under the ERA. . . .
>
> In *Frederick*, we reviewed a similar situation elsewhere in Westmoreland County where the objectors argued that the zoning ordinance violated the ERA by placing UNGD, an alleged industrial use, in agricultural areas. The objectors maintained that the UNGD well would degrade the local environment in which people live, work[,] and recreate, including the public natural resources on which people rely.
>
> The objectors in *Frederick* advanced arguments nearly identical to those raised here. In rejecting these arguments, the fact-finder in *Frederick* relied on [expert] testimony that oil and gas development safely coexisted with agricultural uses in the rural areas of the township. We noted in *Frederick* that the ERA does not call for a stagnant landscape or a derailment of economic development.

27

> By failing to show with credible evidence that UNGD would adversely affect neighboring property owners in the Resource District, [the objectors] failed to establish that the Zoning Ordinance "unreasonably impairs" the rights of Township residents under the ERA. *See Frederick*, 196 A.3d at 697[.]
>
> Further, the plurality in *Robinson* [*Township*] stated that the ERA does not impose express duties on municipalities to enact specific affirmative measures to promote clean air, pure water and the preservation of different values of our environment. As we recognized in *Frederick*, municipalities lack the authority to replicate the environmental oversight that the General Assembly conferred upon DEP and other state agencies. . . . Rather, a zoning ordinance must balance the public interests of the community with the due process rights of private property owners. . . .
>
> In sum, the trial court did not err or abuse its discretion by failing to find that the [z]oning [o]rdinance violated [t]ownship residents' rights under the ERA.

220 A.3d at 1197-98.

Following and applying our decisions in *Frederick* and *Protect PT* and incorporating by reference our prior analysis set forth above, we agree with the trial court's conclusions that the 2017 Amendment does not violate the ERA. Quite simply, on the current record, the MWC did not prove that the 2017 Amendment "unreasonably impairs" the Municipality's citizens' rights under the ERA. Notably, as reflected in our case law, the Municipality was not obligated to conduct a "pre-action environmental impact analysis" and, in enacting an unconventional oil and gas well ordinance, a municipality need only demonstrate, through the ordinance's design or some other form of evidence, that it considered the citizens' rights under the ERA. Here, the Municipality carefully crafted the Overlay District as the place where unconventional oil and gas may be permitted via a conditional use. In so doing, the

28

Municipality decided that it was appropriate for wells to be located in the R-R, R-1, and R-2 Districts, but not the R-3 District or the B-1 Business District, because these districts were more dense, population-wise, and/or contained smaller lot sizes. (Board's F.F. at Nos. 29-31, 53.) Moreover, after the Supreme Court issued *Robinson Township* in 2013, the Municipality reconvened the Task Force and reassessed the appropriate locations for unconventional oil and gas drilling sites in an attempt to minimize the impact of unconventional drilling to the greatest extent possible on the existing population. *See* Board's F.F. at Nos. 40-41, 47, 51, 60, 63, 64, 65.

Therefore, we conclude that the MWC did not carry its burden of proving that the 2017 Amendment violated the ERA.

### III.  The MPC

The MWC asserts that the 2017 Amendment violates various provisions of the MPC because it permits a heavy and industrial use—oil and gas development—in the R-R District and fails to protect the public health and provide a safe and reliable water supply. The MWC further argues that the 2017 Amendment does not comport with the MPC because, "[r]ather than creating uniform classes within each zoning district," the 2017 Amendment "singles out unconventional drilling for special treatment." (MWC's Br. at 47.) According to the MWC, this "necessarily lead[s] to the anomaly that unconventional drilling is permitted in the R-R [D]istrict whether the other uses are compatible or not and[,] due to the overlay[,] not all residents in the R-R district have 'uniform provisions.'" (MWC's Br. at 47.)

Section 604 of the MPC provides, in part, that zoning ordinances shall be designed "[t]o promote, protect and facilitate any or all of the following:  the

29

public health, safety, morals, and the general welfare; coordinated and practical community development and proper density of population . . . ." 53 P.S. §10604.

The MPC further provides:

> Zoning ordinances enacted after the effective date of this act should reflect the policy goals of the municipality as listed in a statement of community development objectives, recognizing that circumstances can necessitate the adoption and timely pursuit of new goals and the enactment of new zoning ordinances which may neither require nor allow for the completion of a new comprehensive plan and approval of new community development objectives.

Section 606 of the MPC, 53 P.S. §10606.

The policy goals set forth in the Municipality's Community Development Objectives track those laid out in the MPC and are as follows:

> A. To promote, protect and facilitate one or more of the following: the public health, safety and general welfare; coordinated and practical community development; proper density of population; civil defense; disaster evacuation; the provision of recreation, open space and harmonious design; the provision of adequate light and air, police protection, vehicle parking and loading space, transportation, water, sewerage, schools, public grounds and other public requirements; and
>
> B. To prevent one or more of the following: overcrowding of land; blight; danger and congestion in travel and transportation; and loss of health, life or property from fire, panic or other dangers.

Ordinance, §201-3.

On review, the trial court provided the following recitation and legal analysis:

> In rendering its decision, the [Board] directly addressed [the MWC's] argument, relying on the Commonwealth Court's holding in *Frederick* which addressed and rejected similar

arguments regarding compliance with the MPC on the same basis that [the] objectors' substantive due process argument was rejected, as discussed above. *Frederick*, 196 A.3d at 698-700. The [Board] additionally made specific findings that the regulations and requirements in the [2017 Amendment] are protective of the welfare and safety of the community and environment, and that [the MWC] failed to set forth any evidence which would tend to show incompatibility of unconventional oil and gas development with the aims of the Community Development Plan. The [Board] thus did not abuse its discretion or commit an error of law in finding that the [2017 Amendment] is in compliance with the MPC.

(Trial court op. at 9-10) (some internal citations omitted).

As noted above by the trial court, in *Frederick*, this Court addressed arguments that are substantially similar to those presented by the MWC here and concluded that they lacked merit:

[The objectors] next argue that [the] [z]oning [o]rdinance . . . violates [s]ections 603(a), 604 and 605 of the MPC. [The objectors] argue it violates [s]ection 603 of the MPC because "the ordinance is potentially detrimental to public health, safety, and general welfare, as well as detrimental to a safe, reliable and adequate water supply within [the R-2 Zoning District]" and, as such, is contrary to the statement of community objectives set forth in the [z]oning [o]rdinance. [The objectors] contend that [the] [z]oning [o]rdinance [] violates [s]ection 604 of the MPC because permitting unconventional gas well development in all zoning districts will . . . place "water sources and other environmental assets at risk[.]" [The objectors] assert that [the] [z]oning [o]rdinance . . . violates [s]ection 605 of the MPC because it allows incompatible uses to take place within the R-2 [z]oning [d]istrict.

[The oil and gas operator] responds that [the objectors'] alleged violations of the MPC reiterate the same arguments they made in their substantive due process claim; their arguments should fail for the same reasons discussed earlier in this opinion. We agree.

31

First, the [z]oning [b]oard held that [the objectors'] claims that [z]oning [o]rdinance 01-2010 will cause safety or environmental problems were not supported by evidence. [The o]bjectors have not challenged any of the [z]oning [b]oard's findings of fact or conclusions of law on these points. Thus, they have not shown a violation under [s]ection 603 of the MPC.

Second, the [z]oning [b]oard rejected [the objectors'] expert and did not credit his testimony. Thus, [the objectors] cannot rely on that evidence to support their concerns under [s]ection 604 of the MPC.

Third, the [z]oning [b]oard rejected [the objectors'] assertion that natural gas development is not a compatible use in the R-2 [z]oning [d]istrict. Again, [the objectors] have not challenged the [z]oning [b]oard's findings and point to no credited evidence that would refute this conclusion. [The objectors] have presented only conclusory arguments without reference to the enumerated uses allowed in the R-2 [z]oning [d]istrict and how oil and gas drilling is incompatible with those uses.

196 A.3d at 699-700 (internal citations omitted).

Notably, in *Delaware Riverkeeper Network*, this Court reiterated that, absent competent proof, an objector's assertion of incompatibility in land uses lacks merit. This is because, without supporting proof, the argument is based "on the faulty premise that unconventional gas drilling is a fundamentally incompatible industrial use as a matter of law in the relevant zoning district." *Id.*, slip op. at n.16.

Here, we affirm the trial court's conclusions that the 2017 Amendment does not violate the MPC. In so doing, we incorporate by reference our preceding analyses addressing the MWC's constitutional arguments, finding that it adequately disposes of the MWC's MPC claims, which are overwhelmingly duplicative of their constitutional claims. In short, we conclude that the MWC failed to demonstrate that

32

unconventional well drilling is a use that is incompatible with the Overlay District as a whole or the R-R District, to the extent that it is located within the Overlay District.

## IV. Special Legislation/Equal Protection

The MWC asserts that the 2017 Amendment violates the equal protection analysis embodied within article III, section 32 of the Pennsylvania Constitution because the Overlay District is a special law that is designed to favor the oil and gas industry. The MWC claims "that only the oil and gas industry was granted an overlay in various residential districts"; since oil and gas operations are not permitted in all of the R-R District, the "citizens that live in [the Municipality's] R-R District are not treated equally"; and, thus, "some residents were given greater protections than others despite the uniform purpose of the R-R District applying evenly to all citizens." (MWC's Br. at 54.)

The MWC further contends that its members "cannot use their property in any manner they please, but there is no reciprocal restriction on the oil and gas industry, which may use whatever land it sees fit in the R-R [] District for intensive, heavy industrial activities . . . simply because a determination has been made to favor that particular industry." (MWC's Br. at 53.) According to the MWC, the 2017 Amendment "readily removed the expectations and safeguards provided for and relied upon by the citizen inhabitants of the R-R District to favor corporate oil and gas interests," (MWC's Br. at 54), and the Municipality, recognizing the harm that oil and gas operations create, "sought to protect the majority of its citizens[] to the detriment of the minority of citizens." (MWC's Br. at 56.)

With respect to claims under article III, section 32, our Supreme Court has "repeatedly held that the underlying purpose of this section is analogous to the

33

equal protection clause of the federal constitution and that our analysis and interpretation of the clause should be guided by the same principles that apply in interpretation of federal equal protection." *DeFazio v. Civil Service Commission of Allegheny County*, 756 A.2d 1103, 1105 (Pa. 2000).

> Equal protection principles do not, however, vitiate the Legislature's power to classify, which necessarily flows from its general power to enact regulations for the health, safety, and welfare of the community. Nor do they prohibit differential treatment of persons having different needs, provided the classifications at issue bear a reasonable relationship to a legitimate state purpose. In this regard, a classification, though discriminatory, will be deemed reasonable if any state of facts reasonably can be conceived to sustain it. However, a classification will be struck down if it is based upon artificial or irrelevant distinctions used for the purpose of evading the constitutional prohibition. In undertaking its analysis, a reviewing court is free to hypothesize reasons the Legislature might have had for the classification.

*Harrisburg School District v. Zogby*, 828 A.2d 1079, 1088-89 (Pa. 2003) (internal citations omitted).

Addressing the equal protection issue advanced by the MWC, the trial court concluded:

> Looking to the decision of the [Board], it is clear that the [Board] made specific findings and conclusions that the classifications set out in the Ordinance are reasonable as opposed to arbitrary. The [] MPC specifically mandates that "[z]oning ordinances shall provide for the reasonable development of minerals in each municipality." 53 P.S. §10603. The [Board] found that the Overlay District provided a reasonable and specific balancing of the rights of the citizens while still allowing for unconventional oil and natural gas development.

(Trial court op. at 12) (internal citations omitted).

34

Upon review, we concur in the trial court's conclusions that the 2017 Amendment does not violate principles of equal protection. Our analyses set forth above in the preceding sections of this opinion, at least to a large degree, severely undermine the MWC's contentions and demonstrate that the Municipality crafted the 2017 Amendment in order to promote oil and gas development in the Overlay District. Contrary to the MWC's assertion, a municipality may create zoning districts that are specifically designed for business and industry purposes, and the distinction between business uses and residential uses is a differentiation that is rationally related to the goal of promoting economic development. To the extent the MWC asserts that the Overlay District violates equal protection because part of the R-R District is not located within the Overlay District, the Municipality had a rational basis for such an exclusion. Specifically, the Municipality devised the Overlay District based on available acreage size and could have reasonably determined that a portion of the R-R District was too dense, geographically speaking, to be included within the Overlay District. *See* Board's F.F. at Nos. 64-65, 71-72. Therefore, we agree with the tribunals below and conclude that the MWC failed to establish that the 2017 Amendment is unlawful special legislation or violates the principles of equal protection of the law.

## V. Overlay District and Comprehensive Plan

The MWC asserts that the 2017 Amendment designs the Overlay District in an unlawful manner. The MWC states that the 2017 Amendment "unduly disturbs the expectations created by the existing R-R [] District, as overlay essentially supersedes the rural and residential nature of the R-R [] District." (MWC's Br. at 58.) In addition, the MWC contends that the 2017 Amendment violates the

requirement that a zoning ordinance must be generally consistent with the comprehensive plan.

"An overlay district creates a framework for conservation or development allowing for a new type of development or imposing restrictions that is superimposed over the zoning districts on all or part of a municipality." *Main Street Development Group, Inc. v. Tinicum Township Board of Supervisors*, 19 A.3d 21, 28 (Pa. Cmwlth. 2011) (*en banc*). "The purpose of an overlay district is to create specific and targeted provisions that conserve natural resources or realize development objectives without unduly disturbing the expectations created by the existing zoning ordinance." *Id.* (emphasis omitted). "In other words, overlay districts supplement existing zoning districts; they do not supersede them either in fact or practice." *Id.*

First and foremost, this Court observes our holding that, "in accord with [s]ection 303(c) of the MPC, no action by the governing body of a municipality shall be invalid or be subject to challenge on appeal on the basis that such action is inconsistent with, or fails to comply with the provisions of a comprehensive plan. 53 P.S. §10303(c)." *Protect PT*, 220 A.3d 1194-95. To a large extent, this legal proposition refutes the MCW's argument that the 2017 Amendment contravenes the Municipality's Comprehensive Plan.

Regardless, and in any event, the Board determined that

there is nothing inconsistent between the Zoning Ordinance and the Comprehensive Plan. The Comprehensive Plan specifically anticipated that the Municipality would embark on a continuing evaluation of its regulation of oil and gas development, which is precisely what it did. The Comprehensive Plan did not state that oil and gas development was incompatible with any specific area of the Municipality, and recommended that the Municipality

36

"strive to have a regional cohesiveness in the preservation of the environment and the development of energy resources." In fact, as Mr. Morrison testified, the Overlay District in the [] Ordinance was drawn to approximately follow the outline of the areas identified in the Comprehensive Plan future development map as lacking the infrastructure to support residential and other development.

(Board's C.O.L. at No. 54.)

Moreover, in *Protect PT*, this Court explained that

[t]he purpose of an overlay district is to craft provisions that conserve natural resources or realize development objectives without unduly disturbing the expectations created by the existing zoning district. The MEO District meets those objectives by providing for the preservation of agricultural operations and development opportunities for owners of mineral resources. In creating the MEO District, the [t]ownship properly balanced the rights of property owners seeking to develop their mineral resources with the need to ensure the health, safety and welfare of neighboring community members and property owners.

Furthermore, in the MEO District, 77.9% of the land is under oil and gas leases. In [*Gorsline v. Board of Supervisors of Fairfield Township*, 186 A.3d 375 (Pa. 2018)], our Supreme Court determined that municipalities are empowered to permit oil and gas development in any or all of its zoning districts. The *Gorsline* [] Court, rather than relegating UNGD solely to industrial zones, instead noted that its decision should *not* be misconstrued as an indication that UNGD was fundamentally incompatible with agricultural and residential zoning districts.

*Id.* at 1195 (emphasis in original).

Here, we agree with the trial court that the 2017 Amendment does not violate the legal concepts of an overlay district. As explained above in our prior analyses, the record demonstrates that the Municipality properly balanced the rights of property owners to lease their lands for unconventional gas well drilling with the

37

need to protect the environment and to ensure the health, safety, and welfare of the neighboring citizens and the Municipality as a whole. Further, akin to the situation in *Protect PT*, here, "[o]f the total leased acreage in the Municipality, 7,000 acres are located within the Overlay District, which is 76.8[%] of the Overly District's land mass." (Board's F.F. at No. 142.) *See Frederick*, 196 A.3d at 684 (stating that approximately 75% of the land mass in the R-2 district is leased to oil and gas operators). However, as in *Protect PT*, this fact does not prove that the Municipality violated the MPC because municipalities are empowered to permit oil and gas development in any or all of its zoning districts. It was the MWC's burden to prove incompatibly of uses. However, the MWC failed to establish that unconventional drilling is a use that is incompatible with the residential uses permitted in the R Districts.

Accordingly, we find no merit in the MWC's arguments challenging the nature and zoning designations of the Overlay District or the Comprehensive Plan.

## VI. Judicial Estoppel

The MWC contends that the Municipality is judicially estopped from denying that unconventional well drilling is an industrial use that is incompatible with residential districts because it advanced this position in its *amicus* brief in *Robinson Township*.

Our Supreme Court has described judicial estoppel as "an equitable, judicially-created doctrine designed to protect the integrity of the courts by preventing litigants from 'playing fast and loose' with the judicial system by adopting whatever position suits the moment." *Sunbeam Corp. v. Liberty Mutual Insurance Co.*, 781 A.2d 1189, 1192 (Pa. 2001) (citation omitted). Under the doctrine of

38

judicial estoppel, "a party to an action is estopped from assuming a position inconsistent with [its] assertion in a previous action, if [its] contention was successfully maintained." *Bienert v. Bienert*, 168 A.3d 248, 255 (Pa. Super. 2017) (citations omitted).

We find no merit in the MWC's argument that judicial estoppel is applicable in this case. In *Robinson Township*, the Supreme Court struck down section 3304 of Act 13—a state statute—in overwhelming part because it commandeered municipalities, permitting oil and gas operations as a use "of right" in every zoning district throughout the Commonwealth, and deprived the municipalities of the ability to pick and choose which districts within its realm are suitable for oil and gas operations based on "environmental and habitability burdens." *Robinson Township*, 83 A.3d at 980. Thus, the Municipality's legal position in that case was made in an attempt to rule Act 13 unconstitutional in order to restore its ability, on the local level, to create and define zoning districts in general, including those in which unconventional oil and gas drilling should be permitted to occur and under what conditions. That legal position is markedly different than the Municipality's position in this case, which seeks to uphold the 2017 Amendment and its legislative decision to allow unconventional oil and gas drilling in the Overlay District. Therefore, we conclude that the Municipality was not judicially estopped with respect to the characterization, nature, and/or effect of unconventional drilling or its suitability in certain zoning districts within its borders.

## VII. Expert Witness

The MWC maintains that the Board erred in permitting Gehringer to testify as an expert when the Intervenor Olympus, Intervenor landowners, and/or

HHEX failed to list or otherwise disclose his identity as an expert and/or an expert report as required by the Board's order. The MWC asserts that it was prejudiced because it could not discern Gehringer's methodology prior to the hearings and, therefore, its ability to examine his testimony was severely hampered.

Here, the Board stated in its decision: "It is specifically noted that Mr. Gehringer was not called as an expert witness but was called as a fact witness to plot existing information that is available in public and other data bases. Mr. Gehringer testified with regard to distances from various properties to the edge of the well pad and location of the hall route." (Board's decision at 1-2.)

The trial court opined:

Looking to the factual record, Mr. Gehringer's testimony consisted of viewing maps and pointing out on those maps locations relative to one another, including the area of the municipality that allows drilling, various well sites and storage facilities, the at-issue well site and [Objectors'] properties. He noted that all information was publicly available and easily obtainable. [The MWC] notes the standard for determining expert versus lay testimony as set out by the Superior Court as follows: "[T]he proffered expert testimony must point to, rely on or cite some scientific authority-whether facts, empirical studies, or the expert's own research that the expert has applied to the facts at hand and which supports the expert's ultimate conclusion." *Nobles v. Staples, Inc.*, 150 A.3d 110, 115 (Pa. Super. 2016). . . . Mr. Gehringer's testimony does not rise to this level, because he was merely presenting the "facts at hand" in this case[,] the mapped locations and distances[,] without the addition of any scientific authority and reasoning to arrive at an expert opinion.

[Intervenor] Olympus additionally notes that a computer[-]generated map is "not scientific evidence and therefore the test for its admissibility should be whether it accurately represents what it purports to represent." *Department of Environmental Resources v. Al Hamilton Contracting Co.*,

40

665 A.2d 849, 852 (Pa. Cmwlth. 1995). Mr. Gehringer merely reiterated the locations and distances on properly admitted maps through his testimony, providing factual evidence to the trier of fact, the [Board]. As such, the [Board] was not in error in accepting Mr. Gehringer's testimony as lay witness testimony for the purpose of conducting its substantive validity challenge.

(Trial court op. at 8-9.)

In *Al Hamilton Contracting Co.*, a case involving issues in connection with a surface mining permit, the Department of Environmental Resources (Department), now Department of Environmental Protection, sought to introduce an exhibit into evidence that was prepared by a hydrogeologist. Specifically, the exhibit "was a composite map of the mine site and the surrounding area created from a photocopy of a map [and] also contained several additional markings made by [the hydrogeologist] which represented the location of the various discharge areas and computer-generated structure contour lines." 665 A.2d at 850. The administrative board concluded that the exhibit did not satisfy the test for the admissibility of scientific, expert testimony under *Frye v. United States*, 293 F.2d 1013 (D.C. Cir. 1923), finding "that the Department had not introduced any evidence indicating that the use of a computer program that converts locations and depths into a topographical contour model has gained general acceptance in the field of hydrogeology." 665 A.2d at 852. On appeal, this Court determined that the *Frye* test was inapplicable because the exhibit "[was] not scientific evidence and therefore the test for its admissibility should [have been] whether it accurately represents what it purports to represent." *Id.* In other cases, courts have generally held that when a witness creates a computer-generated map showing locations and distances and offers testimony with regard to that map, the testimony does not constitute expert testimony; thus, the rules of evidence pertaining to expert testimony do not apply, and the witness need only

41

offer foundational testimony that the map is an accurate depiction in order for the map to be admissible. *See Albig v. Municipal Authority of Westmoreland County*, 502 A.2d 658, 665 (Pa. Super. 1985) ("Unofficial maps are admissible as evidence when verified by the testimony of a witness who has personal knowledge of their accuracy."); *State v. Franklin,* 843 N.E.2d 1267, 1269-71 (Ohio App. 3d 2005) (holding that the testimony of a GIS specialist with regard to measurements and distances generated from a computer software program did not constitute expert testimony requiring expert qualification but, instead, concerned "the knowledge or experience possessed by most lay persons").

Moreover, even if Gehringer rendered expert testimony, Olympus argues that "the [Board] gave [the] MWC's counsel the opportunity to continue the hearing to prepare for cross-examination of Gehringer or to present rebuttal testimony and he declined, thus waiving the objection." (Olympus' Br. at 37-38.) Olympus adds that the Board's invitation was adequate to alleviate any prejudice because "[t]he purpose of an expert report is to provide notice of the expert's expected testimony. Having Gehringer's actual testimony in hand, with the opportunity to cross-examine him at a later date, is far better notice." (Olympus' Br. at 39 & n.21.)

Upon review, we conclude that the Board did not commit prejudicial evidentiary error. First, Gehringer did not provide expert testimony because he did not issue an expert opinion in the typical sense, *e.g.*, an opinion pertaining to the breach of the standard of care or causation, and testified only to factual situations, *i.e.*, the distance between geographic points of reference. Second, even if Gehringer rendered expert testimony, and the MWC was not placed on sufficient notice of that testimony, the Board provided the MWC with the opportunity and time to alleviate and cure any such error. However, the MWC declined to take advantage of the

42

Board's offer and cannot now assert that it was prejudiced. *See United States v. Harris*, 498 F.2d 1164, 1170 (3d Cir. 1974) ("[The defendant] should have taken this course when he learned of the errors, but failed to do so. A defendant may not sit idly by in the face of obvious error and later take advantage of a situation which by his inaction he has helped to create.") (internal quotation marks omitted). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa. Super. 2012). Consequently, we conclude that the MWC is not entitled to relief on its assertions of error with regard to the admissibility of Gehringer's testimony.

## VIII. Adverse Inference

The MWC contends that it is entitled to an adverse inference because

> Morrison was asked why the Council did not consider the Task Force's recommendation concerning setback distances of 1000' based on public health and their impact on their citizens' rights to clean air and pure water when it reduced the setback to 750'. Following an objection by the Municipality's Counsel, [Morrison] was directed to provide [] an answer by the [Board], yet he refused to answer. Despite the [Board] overruling the objection, [the Municipality's] Counsel took the unusual step of silencing the witness contrary to the Board's ruling, saying "I'm directing you not to answer." Counsel for the [MWC] responded, "I would ask for an adverse inference then, that the [B]oard has ruled and the witness is not acting consistent with the ruling."

> Here, [] Morrison failed to testify regarding the Council's consideration of key information on whether its reduced setback is actually consistent with the public health, safety and welfare, but these facts would be well within his knowledge as he was called as a witness by [the Municipality] to recap the ordinance process and what Council did. His unwillingness to testify should be

43

understood to [imply] that the [MWC's] argument that [the Municipality] blatantly ignored this information and did not consider the public health, safety and welfare in violation of its police powers, when minimizing the Task Force's recommended setback from a well site from 1000' to 750' is indeed factually correct, and should further be used to discredit any testimony made to the contrary throughout the course of [] Morrison's testimony. . . .

This inference . . . should be viewed as adverse admissions against interest made by [the Municipality], and as proof of [its] violation of citizens' constitutional rights.

(MWC's Br. at 48-51) (internal citations omitted).

A party's failure to testify can support an adverse inference that whatever testimony he would have given would have been unfavorable to him. *Kennett Square Specialties v. Workers' Compensation Appeal Board (Cruz)*, 31 A.3d 325, 328 (Pa. Cmwlth. 2011). This adverse inference serves to corroborate evidence produced by the opposing party. *Id.* An adverse inference, however, does not constitute evidence and it cannot alone serve as substantial evidence to support a finding of fact. *Id.* at 328-29 (emphasis added). Stated differently,

the inference created when a party refuses to testify is not considered evidence established by the party with the burden of proof, and therefore does not count in calculating whether a party has met its burden in introducing substantial evidence. Rather, the inference is directed to the credibility of the evidence presented by the party with the burden.

*Id.* at 329.

In addition, as explained in Intervenor Olympus' brief, "Council's decision to adopt a 750-foot setback instead of the 1,000-foot setback recommended by the Task Force" is essentially irrelevant because "[t]he recommendation of an advisory body has no binding effect on the governing body." (Olympus' Br. at 27.)

44

This contention is well taken and finds strong support in the case law. Indeed, "this Court previously stated [that] a planning commission is no more than an advisory body whose recommendations have no binding effect on the governing body." *Atherton Development Co. v. Township of Ferguson*, 29 A.3d 1197, 1213 (Pa. Cmwlth. 2011). *See Cleaver v. Board of Adjustment of Tredyffrin Township,* 200 A.2d 408, 413 (Pa. 1964) ("The final decision in zoning matters rests in the legislative body and not in a planning commission, and a township or borough or county or city may adopt or modify or reject any comprehensive or master plan which is prepared by a planning commission.").

For three reasons, we find that the Board's alleged failure to draw an adverse inference from Morrison's counseled decision not to explain or otherwise discuss the Council's consideration, or deliberative process, in not following the recommendation of the Task Force lacks merit. First, despite the Board's ruling, the sought-after testimony is legally irrelevant and possesses no probative value to the legal issues in this case. Second, and alternatively, the MWC did not adduce any competent evidence in support of its constitutional and statutory claims, and an adverse inference is insufficient to carry its burden of proof on those claims. Third, as discussed below, the Council's state of mind in making the decision has no impact on the constitutionality or statutory validity of the 2017 Amendment. Therefore, we conclude that even if the Board was obligated, as fact-finder, to draw an adverse inference, such an inference would be legally insufficient to carry the MWC's evidentiary burden and establish that the 2017 Amendment was unconstitutional or contravened a statute.

45

## IX. Subpoena

Citing Council's duties as trustees under the ERA, the MWC asserts that

> [i]n essence, the trust obligation imposes a burden upon the trustee to "show your work" and provide the decision-making roadmap. This burden fell squarely upon [the] Council to substantiate both how and why its ordinance was appropriately protective of the municipality's [ERA] trust obligations and its beneficiaries' rights. Yet, during the hearing, [the] Council was shielded from any inquiry relating to their trustee obligation. When [the MWC] attempted to subpoena Council members to obtain testimony regarding their trustee obligations, these efforts were denied.

(MWC's Br. at 60-61.)

Under Pennsylvania law, this Court has "held that the courts have no authority to pass upon the motives of a legislative body in enacting a statute or an ordinance." *East Lampeter Township v. County of Lancas*ter, 744 A.2d 359, 365 n.9 (Pa. Cmwlth. 2000). Indeed, "members of a legislative body are not subject to inquiry incident to any challenge of its legislation so that they may have absolute freedom to act in legislative matters for the public welfare, *without fear of being called on for vindication or explanation,* leaving to the courts the function of determining whether such acts transgress the fundamental law." *Id.* (emphasis in original; internal citation omitted). Put simply, "the state of mind of the legislative body in enacting a zoning ordinance is irrelevant to a determination of its validity; rather, the legislation must stand or fall on its own terms." *Id.* (internal citation omitted). Somewhat similarly, a legislative body need not articulate its reasoning at the moment a particular decision is made, and a legislative choice may be based on rational speculation unsupported by evidence or empirical data. *See Adams Outdoor Advertising, LP v. Zoning Hearing Board of Smithfield Township*, 909 A.2d 469, 478

(Pa. Cmwlth. 2006); *Corteal v. Department of Transportation*, 821 A.2d 173, 177 (Pa. Cmwlth. 2003).

Applying the above case law, we conclude that the Board did not err in denying the MWC's request to subpoena Council members because the proffered testimony sought to be obtained was inadmissible and irrelevant to the MWC's constitutional and statutory claims.

## Conclusion

Given this Court's decisions in *Frederick* and *Protect PT*, the MWC's constitutional and statutory claims necessarily fail. Notably, as previously mentioned, the MWC does not challenge any of the Board's specific findings of fact and, as a result, they are binding on this Court. Further, the only evidence submitted by the MWC was entirely speculative in nature. None of Objectors testified; Skeers, the President of MWC, simply voiced his position that unconventional gas drilling should be in an industrial zoning district, and not a residential district; and Statam merely stated that she was worried about the potential effect that the drilling would have on her horses and that unidentified, large trucks drive past her house creating noise. (F.F. Nos. 86, 101, 117-19.) *See Frederick*, 196 A.3d at 689 (stating that the objectors' "expressed concerns" consisted of no more than "speculation of possible harms[,]" which was "insufficient to show that the proposed natural gas well will be detrimental to the health, safety and welfare of the neighborhood"). Although the MWC could have introduced expert testimony regarding the adverse effects of unconventional oil and gas drilling, or even layperson testimony based on first-hand experiences with gas wells, *see generally EQT Production Company v. Borough of Jefferson Hills*, 208 A.3d 1010 (Pa. 2019), it did not. Consequently, the MWC

essentially advances constitutional challenges to the 2017 Amendment on its face, rather than as applied. However, there is nothing inherently illegal about unconventional oil and gas drilling, and this Court has rejected any presumption that the activity will have an adverse effect on the environment or the population or that it is incompatible with residential zoning districts. Finally, the MWC's arguments that are evidentiary in nature are devoid of merit.

Accordingly, and for the above-stated reasons, we affirm the trial court's order, which affirmed the Board's order denying the MWC's legal challenges to the validity of the 2017 Amendment.


_____
PATRICIA A. McCULLOUGH, Judge


Judge Crompton did not participate in this decision.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Murrysville Watch Committee, :
                Appellant :
            :
         v. :
            :
Municipality of Murrysville Zoning :
Hearing Board and Municipality of :
Murrysville :
            : No. 579 C.D. 2020
         v. :
            :
Olympus Energy LLC :
            :
         v. :
            :
David and Cindy Gesuale, Douglas :
and David Geiger, Barry and Pamela :
Paulisick, Free Gospel Church, Inc., :
Doris and Jurgen Ekbert, and Samuel :
and Regina Staymates :

## ***ORDER***

        AND NOW, this 24th day of January, 2022, the May 13, 2020 order of the Court of Common Pleas of Westmoreland County is hereby affirmed.

                         _____
                         PATRICIA A. McCULLOUGH, Judge